IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 14-00236-01-CR-W-BCW |
| TERRELL E. LEWIS, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION TO DENY DEFENDANT'S
## MOTION TO DISMISS THE INDICTMENT

Before the court is defendant's motion to dismiss the indictment on the ground that he fully performed under the terms of a plea agreement in an earlier case which included the dismissal of the charges brought in this case. I find that (1) defendant knew at the time of his guilty plea and at the time of his sentencing that he was required to continue cooperating with the State of Missouri including testifying against Danzel Reese, regardless of when that trial took place, (2) defendant's refusal to cooperate and testify against Reese constituted a breach of the plea agreement, (3) the government was entitled to re-indict defendant on the four previously dismissed charges, and (4) defendant's Constitutional rights were not violated when he entered a plea agreement without the benefit of a grant of immunity from the State of Missouri. Therefore, defendant's motion to dismiss should be denied.

## I.      BACKGROUND

On December 7, 2010, an indictment was returned against defendant, Mohammad Rashid, and Robert Smith charging three Hobbs Act robberies and three counts of using a firearm in connection with a crime of violence. On April 18, 2012,

defendant pled guilty to two of the firearms counts pursuant to a plea agreement. That agreement required defendant to continue cooperating with state authorities regarding a homicide case against Danzel Reese. On September 7, 2012, defendant was sentenced. Pursuant to a motion for downward departure filed by the government, defendant's sentence on the two counts was reduced from 32 years to 12 years; and the other four counts of the indictment were dismissed. In September 2013, defendant was writted from federal custody to Jackson County so the Assistant Prosecutor could prepare him for his pretrial deposition in the state murder case against Danzel Reese. Defendant refused to talk to the prosecutor. His federal attorney visited with him and went over the implications of his refusal to testify, i.e., that the government could move to re-sentence him or re-indict him on the four counts that were dismissed. Defendant continued in his refusal to cooperate, and the murder charges against Danzel Reese were dismissed by the State. As a result of defendant's refusal to cooperate in the murder case, on August 27, 2014, an indictment was returned charging defendant with the original three Hobbs Act robberies and the one gun count that had been dismissed in his earlier case pursuant to the plea agreement.

On September 23, 2015, defendant filed the instant motion to dismiss, arguing that he had performed all that was required of him in the previous federal case and that the instant case constitutes a breach of the plea agreement by the government (document number 24). On October 22, 2015, the government filed a response (document number 31) arguing that defendant breached the plea agreement by refusing to testify against Danzel Reese in the state homicide case. I held a hearing on defendant's motion on January 7, 2016, and January 11, 2016 (document numbers 50,

2

51, and 52). Defendant was present, represented by John Osgood. The government was represented by Assistant United States Attorneys Mike Green and Jeff Valenti.

The following witnesses testified:

1.    Special Agent Michael Mrachek, Federal Bureau of Investigation

2.    Judge Jennifer Phillips, former Assistant Jackson County Prosecutor

3.    Jacquelyn Rokusek, defense attorney

4.    Assistant United States Attorney Mike Green

5.    Sharon Barr, paralegal

In addition, the following exhibits were admitted:

P. Ex. 1      Indictment charging defendant, Mohammad Rashid and Robert Smith with three Hobbs Act robberies and three firearms counts, case number 10-00336-01/03-CR-W-BCW

P. Ex. 2      Certified copy of plea agreement, dated April 18, 2012

P. Ex. 3      Confidential Supplement to Plea Agreement, dated April 18, 2012

P. Ex. 4      Police report of interview of defendant dated April 28, 2011, written by Detective Michael Jones

P. Ex. 6      Jackson County Indictment returned against Danzel Reese

P. Ex. 7      Dismissal of homicide case against Danzel Reese dated December 13, 2013

P. Ex. 8      Government's motion for downward departure filed on September 5, 2012

P. Ex. 9      Judgment and Commitment Order dated September 7, 2012

P. Ex. 11     Email dated November 18, 2013, from AUSA Mike Green to Assistant Prosecutor Jennifer Phillips, forwarding an email from defense counsel Jacquelyn Rokusek

P. Ex. 12     Email dated November 18, 2013, from defense counsel Jacquelyn Rokusek to AUSA Mike Green

3

Defendant was given until January 20, 2016, to brief the issue of attorney-client privilege with respect to the testimony of his previous defense attorney. On January 29, 2016, defendant filed a waiver of attorney-client privilege (document number 56).

## II. FINDINGS OF FACT

Based on the evidence presented during the two-day hearing, I make the following findings of fact:

1.     The FBI was investigating robberies thought to have been committed by a group of men that included Ky Edwards, Mohammad Rashid, Robert Smith and defendant Terrell Lewis (1Tr. at 7).[1] Ky Edwards was charged by himself with a bank robbery and decided to cooperate (2Tr. at 8).[2] Edwards provided information about defendant, Rashid and Smith which led to an indictment, returned on December 7, 2010, charging defendant, Rashid, and Smith with three counts of Hobbs Act robberies and three counts of using a firearm in connection with a crime of violence (P. Ex. 1; 1Tr. at 8; 2Tr. at 8; 3Tr. at 5).[3] Jacquelyn Rokusek was appointed by the court to represent defendant in that case (3Tr. at 4).

2.     At some point after the indictment was returned, defendant decided to cooperate (1Tr. at 8-9; 2Tr. at 10; 3Tr. at 5, 27). A proffer session was set up so that defendant could be interviewed (1Tr. at 9; 2Tr. at 10; 3Tr. at 5). Special Agent Michael Mrachek, Kansas City Missouri Police Detective Tim Smith, and Kansas City Missouri

---

[1]"1Tr." refers to the transcript filed as document number 50.

[2]"2Tr." refers to the transcript filed as document number 51.

[3]"3Tr." refers to the transcript filed as document number 52.

Police Detective Michael Jones were present during the interview of defendant (1Tr. at 9).  Defendant's attorney, Jacquelyn Rokusek, was also present; and Assistant United States Attorney Mike Green was present for a short time to review the <u>Kastigar</u> letter with defendant (1Tr. at 9; 2Tr. at 13, 19; 3Tr. at 5, 34).  The proffer session took place on April 27, 2011 (1Tr. at 9-10).

3.      The first part of the interview involved the Hobbs Act robberies, and the questioning was done primarily by Detective Smith (1Tr. at 10).  The second part of the interview dealt with an unsolved homicide that had occurred in the area of 39th and Main in Kansas City, Missouri (1Tr. at 10, 20; 3Tr. at 6).  Detective Michael Jones from the Homicide Unit conducted this part of the interview (1Tr. at 10, 20; 3Tr. at 6). Defendant said that Danzel Reese committed this homicide, and defendant gave specific details about how the homicide occurred (P. Ex. 4: 1Tr. at 10-12; 3Tr. at 6-7).

4.      Defendant said that on the night of the homicide, he, Danzel Reese, Lavance Jones and a man named Jamal drove to the area of 39th and Main intending to rob a drug dealer at a club (P. Ex. 4: 1Tr. at 20, 34, 57).  Defendant saw Danzel Reese with a .45 caliber handgun (P. Ex. 4: 1Tr. at 20, 34, 57).  Defendant and Lavance remained in the car -- Lavance in the driver's seat and defendant in the front passenger seat -- while Danzel and Jamal walked to the club (P. Ex. 4: 1Tr. at 27). After a while Danzel called defendant on the phone and said the drug dealer did not show up but they were about to rob someone else (P. Ex. 4: 1Tr. at 21, 27, 34).  A few seconds after that phone call ended, defendant heard a single gunshot (P. Ex. 4: 1Tr. at 21, 58).  About a minute later, Danzel and Jamal came running back to the car and got into the back seat (P. Ex. 4: 1Tr. at 21, 58).  Danzel appeared scared and shaky as

5

they drove away (P. Ex. 4). They went to a girl's home to spend the night and Danzel said things went bad and he shot the guy in the head (P. Ex. 4). They learned the person had died by seeing it on the news (P. Ex. 4: 1Tr. at 28).

5. On April 18, 2012, defendant pled guilty to counts 2 and 6 of the indictment, both charging the use of a firearm during and in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (P. Ex. 2: 1Tr. at 13; 2Tr. at 14; 3Tr. at 7, 11). This was pursuant to a plea agreement (to which the State of Missouri was not a party) and a confidential supplement, the purpose of which is to protect defendants who cooperate and then go into federal prisons (P. Ex. 2, 3: 1Tr. at 52; 2Tr. at 12, 19-20; 3Tr. at 8-9, 28-29). Although the State of Missouri was not a party to the plea agreement, it was a beneficiary of the plea agreement since the agreement required defendant to provide cooperation to federal, state or local authorities who could use the information he provided (2Tr. at 23-24).

6. Prior to the change-of-plea hearing, Ms. Rokusek had gone over the Kastigar letter, the plea agreement and the confidential supplemental letter with defendant (3Tr. at 10, 14, 27). It was Ms. Rokusek's understanding that defendant would continue to provide information and testify against Mr. Reese in the homicide case (3Tr. at 7-8). Defendant signed the plea agreement and confidential supplemental letter, and Ms. Rokusek believed that he understood the terms (3Tr. at 10, 14).

7. The confidential supplemental states:

> I agree to cooperate fully and truthfully with the United States before and after I am sentenced, including but not limited to the following:
>
> > d. I agree to hold myself reasonably available for any interviews the United States may require. I waive any right to the

6

presence of counsel at such meetings, debriefings, or pretrial preparation sessions.  I agree that no prior consultation with defense counsel shall be necessary to conduct these meetings, debriefings or interviews, unless my attorney specifically requests such notice;

* * * * *

f.      I understand that my cooperation shall be provided to any local, state, and federal law enforcement agency deemed appropriate by the United States and that I may be called upon as a witness by any authority that has been provided my cooperation. I further understand that it will be necessary for the United States to disclose this cooperation agreement to opposing counsel if I am called or scheduled to testify as a witness for the prosecution in any future court hearing or trial in accordance with this cooperation agreement.

g.      I agree and understand that this cooperation agreement requires that my cooperation continues even after the time I am sentenced.  Failure to continue to cooperate after a sentence is imposed constitutes a basis to void this agreement by the United States and will allow the Government to re-institute charges that were previously dismissed pursuant to this agreement[.]

(P. Ex. 3; 3Tr. at 13, 50-51).

8.      Defendant was sentenced on September 7, 2012, to 72 months on each of two counts with the sentences to run consecutively for a total of 144 months in prison (P. Ex. 9: 1Tr. at 13-14; 3Tr. at 14).  Counts 1, 3, 4, and 5 were dismissed on motion of the government (P. Ex. 9).  The sentence was a result of a motion to depart downward filed by the government because as of the day of sentencing, defendant was cooperating (2Tr. at 14; 3Tr. at 29).  The motion stated that defendant provided "substantial assistance in the investigation and prosecution of others.  Lewis, following his arrest, provided information to Kansas City, Missouri Police Department detectives about another person's involvement in a homicide.  Lewis's information led Jackson

7

County authorities to file murder charges against this person. Lewis was also prepared to testify, if needed, against Co-defendant Mohammad Rashid. If Rashid had gone to trial, Lewis would have been called as a Government witness." (P. Ex. 8; 3Tr. at 31).

9.     Without the downward departure, defendant would have been sentenced to 32 years on those two counts instead of the 12 he received (2Tr. at 22; 3Tr. at 11, 14-15). The main form of defendant's cooperation related to the state homicide charge against Danzel Reese; therefore, the federal government's position was that defendant had a duty to continue to cooperate for the length of that state prosecution (2Tr. at 14, 26). Defense counsel Jacquelyn Rokusek's understanding was also that defendant had a continuing duty to cooperate on the homicide case against Danzel Reese (3r. at 51).

10.     Defendant was sentenced on his federal conviction before the state homicide case was resolved; the federal prosecutor has no control over the timing of state criminal cases (2Tr. at 21). Because it could be years before the murder case was resolved in Jackson County, AUSA Mike Green gave defendant the benefit of what he had done and what he had promised to do by filing the motion for downward departure and dismissing four of the six counts against him at the time of his sentencing (2Tr. at 22).

11.     Once defendant was sentenced, because no appeal was filed, Ms. Rokusek considered her representation of defendant to have concluded[4] (3Tr. at 15).

---

[4]Ms. Rokusek was later asked, "Even though you maybe filed a voucher and had been paid, would you agree with me the attorney-client relationship in a case extends *ad infinitum*?" to which she responded, "Right. Even if you're not being paid, yes." Q. "Yes. We can destroy the records after ten years, but still we're the man's lawyer from now until the day we get planted, correct?" A. "As it regards to that case." (3Tr. at 41).

However, the plea agreement extended beyond defendant's providing information and required him to testify if called in the murder trial, whenever that may occur (3Tr. at 50).

12.     In January 2013, Jennifer Phillips was named Chief Trial Assistant of the Violent Crimes Unit in the Jackson County Prosecutor's Office (1Tr. at 31).  A murder case against Danzel Reese had been assigned to a prosecutor who left the office sometime during 2013; and as part of her duties as Chief Trial Assistant, Ms. Phillips was responsible for reassigning that prosecutor's cases (1Tr. at 31).  Because the trial in Reese's case was coming up in December 2013, Ms. Phillips decided to keep that case rather than reassign it to another prosecutor (1Tr. at 31-32, 35).  Reese had been charged with second degree murder (i.e., felony murder), first degree robbery, and two counts of armed criminal action (1Tr. at 33).

13.     After reviewing the Danzel Reese file, Ms. Phillips determined that defendant was going to be an important witness for the prosecution (1Tr. at 34-35).  She knew that defendant had received a benefit at the federal level as a result of his agreement to cooperate in the prosecution of Mr. Reese (1Tr. at 35).  She contacted AUSA Mike Green to obtain defendant's federal indictment, plea agreement, and downward departure motion (1Tr. at 35-36).  She planned to have defendant produced as a witness to Reese's attorney, and she needed to provide those federal documents to Reese's attorney as well (1Tr. at 36).

14.     In order to writ defendant out of federal custody for this purpose, the state trial judge set a hearing date in September (1Tr. at 36, 68).  Defendant was brought to the Jackson County Jail on August 31, 2013 (1Tr. at 36-37).  Along with the writ paperwork, a "keep away" was prepared in order to keep defendant away from Danzel

Reese who was also at the Jackson County Jail (1Tr. at 37-38). The plan was for defendant to be deposed and then shipped back to federal custody so that he was in the Jackson County Jail for the shortest period possible (1Tr. at 42).

15. Because defendant would be deposed by Reese's attorney prior to trial, Ms. Phillips met with defendant when he arrived in Jackson County to prepare him for the deposition (1Tr. at 38, 69). Ms. Phillips had been a prosecutor for over ten years, so she knew she would be recognized as such at the jail by inmates; therefore, she called the jail and asked that defendant be brought to her office so that no inmates would see him talking to a prosecutor (1Tr. at 38). Defendant was brought to Ms. Phillips's office in the Jackson County Courthouse by two Jackson County jail guards (1Tr. at 38-39). Her intent was to interview him in order to review with him what he had previously told police about the Danzel Reese murder case (1Tr. at 64).

16. Ms. Phillips got a call indicating that defendant was outside her office (1Tr. at 39). She went into the lobby area, introduced herself, and then walked back to her office with defendant and the two guards (1Tr. at 39). Ms. Phillips explained to defendant why she wanted to speak to him, and he refused to talk to her (1Tr. at 39). Her first impression of defendant was that he was not happy and did not want to be there (1Tr. at 39). That attitude continued in her office, and the meeting was so brief that the parties did not even sit down (1Tr. at 40). Ms. Phillips said she wanted to talk to defendant about the murder of Lance Rutter involving Danzel Reese which defendant had given a statement about to police (1Tr. at 40). Defendant said he did not remember and he wanted to "go back," meaning either to the jail or to federal custody, but away from Ms. Phillips (1Tr. at 40, 69). She said it was her understanding

10

that he had received a federal benefit for his cooperation and if he refused to cooperate she would try to get that benefit taken away (1Tr. at 40). He said he wanted to "go back" (1Tr. at 40-41).

17.     This entire encounter lasted approximately two or three minutes (1Tr. at 41). At no time did defendant mention any concerns about incriminating himself or about the Fifth Amendment (1Tr. at 41). He simply said he did not remember, and did not say what caused him to forget (1Tr. at 41, 59-60). Ms. Phillips did not believe that defendant did not remember -- her impression was that he was refusing to talk to her (1Tr. at 69). The jail guards took defendant back to the Jackson County Jail (1Tr. at 41).

18.     Ms. Phillips then called AUSA Mike Green to see if anything could be done to get defendant to cooperate because she considered him an essential witness against Danzel Reese (1Tr. at 42, 43; 2Tr. at 16). Mr. Green indicated he would reach out to defendant's federal attorney and ask her to talk to him, so Ms. Phillips decided to keep defendant at the Jackson County Jail so the attorney would have access to him (1Tr. at 42, 43). Ms. Phillips believed that Ms. Rokusek's representation of defendant had ended at his federal sentencing, so she considered Ms. Rokusek's attempt to get defendant to go forward with the cooperation to be a favor to the State (1Tr. at 61-63, 65, 67). Because there was no pending case against defendant either in state court or federal court, Ms. Phillips did not believe defendant needed to have a lawyer with him when she met with him to prepare for the trial against Danzel Reese (1Tr. at 65-66).

19.     Sometime in September 2013, AUSA Mike Green called Ms. Rokusek and asked her to talk to defendant about his continued cooperation and testimony in the

11

Danzel Reese murder case (3Tr. at 15). He said that Jackson County Assistant Prosecutor Jennifer Phillips had tried to meet with defendant but he was refusing to cooperate (3Tr. at 15). Ms. Rokusek agreed to talk to defendant (3Tr. at 15-16). She went to the United States Attorney's Office to get copies of the plea agreement and confidential supplement before going to the Jackson County Jail to meet with defendant (3Tr. at 16).

20.     Ms. Rokusek saw defendant on Saturday, November 16, 2013[5] (3Tr. at 17, 19). She discussed with defendant the implications of his decision not to testify (3Tr. at 20). By the time Ms. Rokusek left that day, defendant had made a final decision not to testify (3Tr. at 20).

21.     On Monday, November 18, 2013, Ms. Rokusek emailed AUSA Mike Green as follows: "Mike, not sure if you received my previous message, but Terrell Lewis is refusing to testify. He tells me that the extended time in segregation impacted his memory. Jackie" (P. Ex. 12; 3Tr. at 18). A few minutes later, Mr. Green responded as follows: "Does Mr. Lewis understand that this likely will result in either dismissed charges being reinstated or the government petitioning for resentencing?" (P. Ex. 12; 3Tr. at 19). A few minutes later, Ms. Rokusek responded as follows: "I tried to explain that to him. I am not giving up hope that he will come around, but he was traumatized by his segregation and is somehow convinced he could be segregated again. He nearly went crazy while in seg. I will continue to work on him." (P. Ex. 12; 3Tr. at 19). To Ms. Rokusek's knowledge, defendant never changed his mind about refusing to

---

[5]She attempted to see defendant before that but was unsuccessful due to the jail being on lock down (3Tr. at 16, 19).

testify (3Tr. at 20). Defendant told her that it had become a significant issue that he had to spend time in segregation and he was "terrified" of going back into segregation if he were called to testify at Reese's trial (3Tr. at 45). Defendant understood that by not testifying, he was breaching his plea agreement and that the government could re-file the dismissed charges (3Tr. at 45-47).

22.     Mr. Green forwarded the email chain between Ms. Rokusek and himself to Jackson County Assistant Prosecutor Jennifer Phillips that same morning (P. Ex. 11; 1Tr. at 43, 44, 70). The emails indicated that defendant was still refusing to cooperate despite having had conversations with his attorney (1Tr. at 43, 44, 70). And despite being aware of the potential consequences for not cooperating or not testifying, he was still refusing to assist in the prosecution of Danzel Reese (1Tr. at 43, 48). Ms. Phillips discussed the situation with the Jackson County Prosecutor and Deputy Prosecutor, and it was decided that the office could not proceed in the prosecution of Danzel Reese without defendant's testimony, so the murder case against Danzel Reese was dismissed (1Tr. at 44). This occurred on December 13, 2013 (P. Ex. 7).

23.     At the time this was going on, Ms. Phillips had 11 years of experience as a prosecutor and was familiar with the procedure for obtaining witness immunity (1Tr. at 45). To give informal immunity, Ms. Phillips would write a letter to the witness's attorney indicating that as long as the witness was truthful and forthcoming, the State would not pursue a prosecution against the witness for certain circumstances (1Tr. at 46). Formal immunity required an appearance before a judge (1Tr. at 46). Immunity is not given unless the witness or his attorney requests it (1Tr. at 46, 61).

24.     Ms. Philips did not believe defendant's was a situation that required immunity (1Tr. at 46).  She did not believe there was sufficient evidence to prove felony murder against defendant beyond a reasonable doubt (1Tr. at 46).  Although he had knowledge of the plan to rob the drug dealer, he remained in the car and had little or no knowledge of the plan to rob the victim of the homicide (1Tr. at 46-47).  In addition, the only evidence she had against defendant came from his own statements -- there was no separate evidence about defendant's involvement in or knowledge of the robbery and due to the circumstances of his statement, she did not believe the State would be able to use his statement as evidence against him (1Tr. at 47).  If she believed she could charge defendant with the felony murder in order to force him to cooperate, she would have done it (1Tr. at 56-57).

25.     Mr. Green did not believe the federal plea agreement needed to include immunity from state prosecution because that was completely up to the State and it was his understanding that defendant was a fact witness in the homicide case (2Tr. at 18).  Ms. Rokusek never requested immunity because defendant never indicated he was at all concerned that his testimony could subject him to state charges (3Tr. at 52).

### III.     BREACH OF THE PLEA AGREEMENT

It is undisputed that the plea agreement was breached. The parties disagree, however, on which one breached it, each pointing the finger at the other.  Defendant's position is not entirely clear.  He does argue that the government breached the plea agreement by returning the instant indictment.  However, in his brief and during the hearing, defendant apparently had complaints about the process prior to the return of this indictment, i.e., he should have been offered immunity at various times throughout

14

the process, his attorney should have been notified that he was being brought in for pretrial preparation in Jackson County, etc. The government's position is clear -- defendant breached the plea agreement when he refused to cooperate and testify at the trial of Danzel Reese.

Plea agreements are essentially contracts and "should be interpreted according to general contract principles." United States v. DeWitt, 366 F.3d 667, 669 (8th Cir. 2004). See also United States v. Bartel, 698 F.3d 658, 662 (8th Cir. 2012) ("To determine whether the plea agreement has been breached, we 'interpret the agreement according to general contract principles'") (citing United States v. Raifsnider, 663 F.3d 1004, 1009 (8th Cir. 2011)).

> Issues concerning the interpretation and enforcement of the plea agreement are issues of law reviewed de novo. United States v. Coleman, 895 F.2d at 505. "A plea agreement is contractual in nature and generally governed by ordinary contract principles. A plea agreement is more than merely a contract between two parties, however, and must be attended by constitutional safeguards to ensure a defendant receives the performance he is due." United States v. Britt, 917 F.2d at 359. "Allowing the government to breach a promise that induced a guilty plea violates due process." Margalli-Olvera v. INS, 43 F.3d at 351, citing Mabry v. Johnson, 467 U.S. 504, 509 (1984), and Santobello v. New York, 404 U.S. 257, 262 (1971). "[W]ith respect to federal prosecutions, the courts' concerns run even wider than protection of the defendant's individual constitutional rights -- to concerns for the 'honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government.'" United States v. Harvey, 7691 F.2d at 300, citing United States v. Carter, 454 F.2d 426, 428 (4th Cir. 1972). "There are two potential remedies for the government's breach of a plea agreement: remand for specific performance and withdrawal of the guilty plea. The decision as to which to grant rests in the sound discretion of the court." Margalli-Olvera v. INS, 43 F.3d at 354-355 (citations omitted).

United States v. Van Thournout, 100 F.3d 590, 594 (8th Cir. 1996).

15

Plea agreements are not, however, analyzed entirely consistent with civil

contract law, as noted by the Court of Appeals in United States v. Olesen, 920 F.2d 538

(8th Cir. 1990):

> This court has . . . acknowledged the inherent limits of the contract analogy. In
> United States v. Vogt, 901 F.2d 100 (8th Cir. 1990), we applied contract
> principles to decide that the government waived its right to complain of the
> defendant's breach. . . . After applying the Restatement (Second) of Contracts,
> we noted that "'contract principles provide a *useful means by which to analyze*
> the enforceability of plea agreements.'" Id. (emphasis added). . . . In Partida-
> Parra, [859 F.2d 629, 634 (9th Cir. 1988)] the Ninth Circuit specifically refused to
> apply the contract doctrine of mutual mistake to plea agreements. Recognizing
> the limitation of the plea agreement/contract analogy, the court held that district
> courts could not "revisit an accepted plea to consider whether [a] 'contract' was
> formed (as distinct from considering whether it was breached)." Id.

United States v. Olesen, 920 F.2d at 542.

> Furthermore, agency law is not used to interpret the terms of a plea agreement:

> [C]ommon law agency principles have limited applicability to the relationship
> between a criminal defendant and his lawyer. In the civil context, when an agent
> exceeds his authority and binds his principal to a third party, the principal has a
> cause of action against his agent. Thus, for example, if an agent's actions cause
> the principal loss, the principal may recover that loss from the agent, thereby
> making the principal whole again. No such remedy is available in the criminal
> context when, for example, counsel breaches a plea agreement without his
> client's consent. At best, the client has a claim for ineffective assistance of
> counsel. But the legal standard governing ineffective assistance claims differs
> drastically from that which governs a civil cause of action for damages.

> Second, application of common law agency principles would do violence to the
> well established distinction between "strategic" and "fundamental" decisions.
> [Using principles of agency law,] this distinction would be obliterated, as counsel
> would be authorized to make <u>any</u> decision in the course of representation without
> consulting his client. . . .

> Third, no court has ever applied the law of agency in the context of a criminal
> prosecution. . . .

United States v. Guyton, 37 F. Supp. 3d 840, 854 (E.D. La. 2014).

16

This court, therefore, may not revisit the plea agreement to determine whether it was valid, i.e., to determine whether there was truly a meeting of the minds, etc. The sole question before me is whether the plea agreement was breached and if so by whom.

The party asserting a breach of a plea agreement has the burden of establishing a breach. United States v. Bartel, 698 F.3d 658, 662 (8th Cir. 2012); United States v. Raifsnider, 663 F.3d 1004, 1009 (8th Cir. 2011); United States v. Yellow, 627 F.3d 706, 709 (8th Cir. 2010). If defendant did not breach the plea agreement, then it is obvious that the government did by recharging him with the crimes which were dismissed pursuant to that plea agreement. However, in this case, I find that defendant breached the agreement by refusing to cooperate with the Jackson County Prosecutor's Office including refusing to testify against Danzel Reese resulting in the dismissal of murder charges. Therefore, the government was entitled to re-indict defendant on the four previously dismissed counts.

The government argues that defendant was required by the plea agreement to continue cooperating with the State of Missouri including testifying at trial until the resolution of the murder case against Danzel Reese, and that his refusal to do so constituted a breach.

The undisputed evidence before me is that all of the parties and all of the attorneys understood that the plea agreement required defendant to cooperate and testify at the trial of Danzel Reese regardless of whether that occurred before or after sentencing in his federal case. Prior to the change-of-plea hearing, Ms. Rokusek went over the Kastigar letter, the plea agreement and the confidential supplemental letter

17

with defendant (3Tr. at 10, 14, 27). He signed those documents, and Ms. Rokusek believed that he understood the terms (3Tr. at 10, 14). At the time of sentencing, the federal government's position was that defendant had a duty to continue to cooperate for the length of that state prosecution (2Tr. at 14, 26). Defense counsel's understanding was that defendant had a continuing duty to cooperate on the homicide case against Danzel Reese (3r. at 51). There is absolutely no evidence before me that defendant did not understand at the time he pled guilty and at the time he was sentenced in the federal case that he had a continuing duty to cooperate and testify in the murder case against Danzel Reese. He did not tell Ms. Phillips that he believed he was not required to cooperate and testify. He did not tell Ms. Rokusek that he believed he was not required to cooperate and testify. He did not testify at the hearing on this motion to dismiss that he believed he was not required to cooperate and testify.

There has been no shortage of argument by current defense counsel that defendant's duty to testify in the state murder case ended on the day he was sentenced in his first federal case. However, there is no evidence in the record to support those arguments. All of the evidence, as well as common sense, support the interpretation of the plea agreement that defendant was to continue to cooperate with the State and testify in the murder case against Danzel Reese. Defendant received a 20-year reduction in his federal sentence as well as the dismissal of four counts (one of which had a statutory mandatory minimum consecutive sentence) in exchange for his cooperation and guilty plea, which is a substantial benefit.

The plea agreement and confidential supplement state that defendant is required to cooperate fully and truthfully "before and after" he is sentenced (P. Ex. 3, page 1,

18

paragraph 5), that he is required to provide all information concerning his knowledge of and participation in "any other crimes about which I have knowledge," (P. Ex. 3, page 1, paragraph 5.a.), that he is required to testify as a witness when requested to do so by the United States (P. Ex. 3, page 2, paragraph 5.c.), that he will be available for interviews, meetings, debriefings and pretrial preparation sessions without the presence of counsel (P. Ex. 3, page 2, paragraph 5.d.), that he is required to cooperate with any local, state or federal law enforcement agency deemed appropriate by the United States (P. Ex. 3, page 2, paragraph 5.f.), and that he is required to testify as a witness upon being called by "any authority that has been provided my cooperation," (P. Ex. 3, page 2, paragraph 5.f.). The confidential supplement states as follows:

> I agree and understand that this cooperation agreement requires that my cooperation continues even after the time I am sentenced. Failure to continue to cooperate after a sentence is imposed constitutes a basis to void this agreement by the United States and will allow the Government to re-institute charges that were previously dismissed pursuant to this agreement.

(P. Ex. 3, page 2, paragraph 5.g.).

Defendant signed the plea agreement and he signed the confidential supplement. There is no question that he knew he was required to cooperate and testify in the murder trial of Danzel Reese regardless of whether that occurred before or after his federal sentencing. His failure to do so constituted a breach of the plea agreement, and the government was entitled to re-indict him on the four counts that had been dismissed as a part of that plea agreement.

In his motion and during the hearing, defendant through counsel spent significant time and effort on the issue of whether defendant's due process rights were violated when he was advised to sign this plea agreement without the benefit of immunity from

19

the State who, according to defense counsel, could have (and could still) charge defendant with felony murder based on the information he provided about the murder of Lance Rutter by Danzel Reese.  Defendant's argument is without merit.

First, the confidential supplement includes the following:

I understand that this agreement does not foreclose the prosecution for an act of murder or attempted murder . . . or a conspiracy to commit any such acts of violence . . .

(P. Ex. 3, page 4, paragraph 8).  Therefore, it is completely irrelevant whether defendant was aware of the dual-sovereignty law or the law of conspiracy or the law of felony murder.  He was told right up front that this plea agreement would not foreclose a charge of murder.  However, because defendant provided information about a murder committed by someone else and this provision was included in the plea agreement, it seems clear to me that no one at that time (not the prosecutor, the defense attorney or defendant himself) believed that there was a chance he would be prosecuted for murder if that crime happened the way he reported it.  This exception -- that the plea agreement does not foreclose the prosecution for murder, attempted murder or conspiracy to commit murder -- is included in the event police learn that defendant actually had a more active role in the murder than he was reporting at the time.

Second, Jennifer Phillips testified that in her opinion defendant could not be charged with felony murder or conspiracy based on the evidence, both in form and in the way it was obtained.  Ms. Phillips was a county prosecutor for well over ten years and served as Chief Trial Assistant of the Violent Crimes Unit.  In addition, at the time of her testimony, she had been a Jackson County Circuit Court Judge for nearly a year.

If anyone involved in this case is qualified to interpret Missouri law on prosecuting someone for felony murder, it is Judge Phillips.

My cursory review of the law is consistent with her opinion. Because co-conspirators have all agreed to participate in the commission of a crime, each co-conspirator is liable for any other crime committed by any other co-conspirator *if the crime was committed in furtherance of the conspiracy* and the crime was a reasonably foreseeable result of the conspiracy. <u>Pinkerton v. United States</u>, 328 U.S. 640 (1946) (emphasis added). R.S. Mo. § 564.016.6 (1) states that, "[c]onspiracy is a continuing course of conduct which terminates when the offense or offenses which are its object are committed or the agreement that they be committed *is abandoned by the defendant and by those with whom he conspired*." (emphasis added). "Generally it is said that after the common enterprise is ended, whether by accomplishment or abandonment, no one of the conspirators or joint actors is permitted by any subsequent act or declaration of his own to affect the others." <u>State v. Chernick</u>, 280 S.W.2d 56, 59-60 (Mo. 1955).

The information provided by defendant with regard to the murder of Lance Rutter is that defendant and three others agreed to commit a robbery of a drug dealer, one of the conspirators was in possession of a gun, he and another conspirator went to a club to wait for the drug dealer while defendant and the fourth conspirator waited in the car, and then the gun-wielding conspirator called defendant and said the drug dealer did not show up. At this point, the object of the conspiracy has arguably been abandoned. Reese's statement before hanging up that he was going to rob someone else is not, according to Judge Phillips's testimony, enough to create a new conspiracy between the original members or to resurrect the abandoned conspiracy to rob the drug dealer. I

21

accept Judge Phillips's opinion that those circumstances are insufficient to establish a case of felony murder or conspiracy against defendant. However, as stated above, the fact that the federal plea agreement specifically stated that defendant could be charged with murder or conspiracy to commit murder, whether he could technically be charged by the State of Missouri given the specific facts of Lance Rutter's murder is not material. Therefore, the issue of whether he should have been offered immunity (regardless of the fact that he never requested it) is also immaterial.

## V.    CONCLUSION

Based on all of the above, I find that (1) defendant knew at the time of his guilty plea and at the time of his sentencing that he was required to continue cooperating with the State including testifying against Danzel Reese, regardless of when that trial took place, (2) defendant's refusal to cooperate and testify against Reese constituted a breach of the plea agreement, (3) the government was entitled to re-indict defendant on the four previously dismissed charges, and (4) defendant's Constitutional rights were not violated when he entered a plea agreement without the benefit of a grant of immunity from the State of Missouri. Therefore, it is

RECOMMENDED that the court, after an independent review of the pleadings, evidence, and applicable law, enter an order denying the defendant's motion to dismiss the indictment.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has 14 days from the date of this report and recommendation to file and serve specific objections unless an extension of time for good cause is obtained.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 15, 2016

23